UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 11-141 (RHK/JJK)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **SUPERSEDING INDICTMENT** |
| | ) | |
| Plaintiff, | ) | (15 U.S.C. § 77q(a)) |
| | ) | (15 U.S.C. § 77(x)) |
| v. | ) | (18 U.S.C. § 2) |
| | ) | (18 U.S.C. § 1001) |
| (1) FRANK ELROY VENNES, JR., and | ) | (18 U.S.C. § 1014) |
| | ) | (18 U.S.C. § 1341) |
| (4) JAMES NATHAN FRY, | ) | (18 U.S.C. § 1343) |
| | ) | (18 U.S.C. § 1344) |
| Defendants. | ) | (18 U.S.C. § 1957) |

THE UNITED STATES GRAND JURY CHARGES:

**INTRODUCTION**

1.  At all times relevant to this Indictment, Thomas J. Petters owned and operated Petters Company, Inc. ("PCI"). From the late 1990s until in or about September 2008, Petters obtained billions of dollars from investors in exchange for promissory notes issued by PCI ("PCI Notes"). Investors were told that money provided to Petters was used for the purchase of consumer goods which Petters then later sold at a profit, a portion of which was returned to investors as investment return on the PCI Notes. In reality, Petters was operating a massive Ponzi scheme. Virtually no consumer goods were bought or sold by PCI and, over the years, Petters created the appearance of a return on the investment by repaying investor funds with new investor funds. Investors lost billions of dollars when the Ponzi scheme collapsed in September of 2008.

SCANNED

JUL 20 2011

U.S. DISTRICT COURT MPLS

FILED **JUL 19 2011**

RICHARD D. SLETTEN, CLERK

JUDGMENT ENTERED _____

DEPUTY CLERKS INITIALS _____

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

2.   At all times relevant to this Indictment, defendant FRANK ELROY VENNES, JR., was a business associate of Thomas J. Petters and primary fundraiser for PCI. As set forth in detail below in paragraphs 11 - 16, starting in or about 1995 and continuing until in or about September 2008, VENNES raised money from investors to invest in PCI. VENNES was the owner and CEO of, and did business through, Metro Gem, Inc. VENNES raised money directly from individual investors with Metro Gem which he used to purchase PCI Notes. VENNES also raised money by inducing large hedge funds to raise money from investors to purchase PCI Notes.

3.   At all times relevant to this Indictment, defendant JAMES NATHAN FRY was the Chief Executive Officer of Arrowhead Capital Management, LLC ("Arrowhead Management"), a Minnesota company that he founded and owned and which acted as an investment advisor to a number of hedge funds collectively referred to herein as the "Arrowhead Funds." As set forth in detail below in paragraphs 17 - 22, beginning in or about 1999, VENNES collaborated with FRY to raise money for Petters and PCI through the Arrowhead Funds. From in or about 1999 through 2008, FRY solicited investors through the Arrowhead Funds and FRY invested hundreds of millions of dollars of Arrowhead Funds investors' money in PCI Notes. As of September 2008, the Arrowhead funds had approximately $130 million invested in PCI Notes. In almost every transaction, VENNES acted as the

2

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

intermediary between FRY and PCI with respect to each investment in PCI Notes and VENNES was paid a commission by Petters for money VENNES brought in through FRY.

4.   At all times relevant to this Indictment, defendants DAVID WILLIAM HARROLD and BRUCE FRANCIS PREVOST were the owners and operators of two management companies which managed hedge funds invested exclusively in PCI Notes, collectively referred to herein as the "Palm Beach Funds."   As set forth in detail below in paragraphs 23 - 30, in approximately 2002, VENNES introduced HARROLD and PREVOST to Petters and recruited HARROLD and PREVOST to raise money for Petters and PCI through the Palm Beach Funds.  From 2002 through 2008, HARROLD and PREVOST directed billions of dollars of Palm Beach Funds investors' money into PCI notes.  As of September 2008, more than one billion dollars of Palm Beach Funds investors' money was invested in PCI Notes.  VENNES acted as an intermediary between HARROLD and PREVOST and PCI with respect to each investment in PCI Notes and VENNES was paid a commission by Petters for money VENNES brought in through HARROLD and PREVOST.

## THE PETTERS FRAUD

5.   Petters Company, Inc. ("PCI") was owned and operated by Thomas J. Petters.

6.   From the late 1990s until in or about September 2008, Petters obtained billions of dollars from investors in exchange for

3

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

short-term, trade finance, promissory notes issued by PCI ("PCI Notes").

7.    To induce the investment, Petters and PCI represented to investors that funds invested in PCI Notes would be used to finance the purchase of vast amounts of consumer electronics and other consumer merchandise from certain suppliers.  Petters further represented that PCI would resell the merchandise at a profit to certain "Big Box" retailers, including such well-known chains as Sam's Club and Costco.

8.    In reality, the transactions underlying virtually all PCI Notes were fictitious.  Documents evidencing the purported transactions were fabricated by Petters' criminal associates, and the purported suppliers of the electronic goods were shell companies acting in concert with Petters.  No retailers participated in the transactions underlying virtually all of the PCI Notes and there were no purchases and resales of consumer electronics or other consumer merchandise.  Instead, Petters diverted hundreds of millions of dollars to his own purposes and paid purported profits to investors with money raised from the sale of new notes.

9.    Petters' inventory finance operation was a Ponzi scheme, which was brought to light after federal agents executed search warrants at Petters' business offices and other locations on

4

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

September 24, 2008.  Petters and several of his criminal associates were convicted and sentenced to imprisonment.

10.  Petters began the PCI Ponzi scheme in or before 1993 and starting in the late 1990s raised most of the proceeds of the fraud by selling PCI Notes to large hedge funds, managed and operated by hedge fund managers who obtained fees from investor funds.  Some of these fees were calculated as a percentage of the money invested by those managers' hedge funds in PCI Notes, and some of these fees were calculated as a percentage of trading profits.

## METRO GEM, INC.

11.  In or about 1995, VENNES began a long-term business relationship with Petters.  In or about 1995, VENNES founded Metro Gem, Inc. ("Metro Gem").  VENNES was the owner and Chief Executive Officer of Metro Gem.  The primary business of Metro Gem from 1995 up and until 2008 was obtaining funds for Petters for investment in PCI Notes.

12.  In 1995, VENNES began soliciting money from individuals through Metro Gem to invest with Petters/PCI.  VENNES took money from individual investors and issued them promissory notes from Metro Gem for repayment of principal and interest.  VENNES then pooled Metro Gem investors' money which he lent to Petters and PCI, purportedly for the purchase of consumer goods which Petters would resell at a profit.  In exchange, Petters issued promissory notes

5

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

to Metro Gem for repayment of principal plus interest on a specified date, usually 90 days after the notes were funded. VENNES continued taking money from investors to be invested in PCI Notes up and until September 2008.

13.   From 1999 through September 2008, in approximately 748 investment transactions, VENNES invested Metro Gem investors' money in PCI Notes.  As of September 24, 2008, approximately $130 million dollars of Metro Gem investors' money was in PCI.

14.   From 2001 through September 2008, VENNES and Metro Gem made more than $80 million related to the Metro Gem investors' investment in PCI Notes.

15.   In or around 1998, VENNES began seeking larger sources of financing for Petters and PCI.  Petters paid VENNES a commission based on a percentage of all funds he brought into PCI.  As described in detail in paragraph 38, below, VENNES had previously been convicted on federal narcotics, firearms and money laundering charges.  His criminal record made it difficult to secure financing directly from larger institutional investors.

16.   As part of VENNES's efforts to bring in larger funding sources for Petters and PCI (and commissions for himself), VENNES worked with other individuals to form hedge funds to solicit institutional investment in PCI Notes, including the Arrowhead Funds and the Palm Beach Funds.

6

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

## THE ARROWHEAD FUNDS

17.   Among the hedge funds that solicited investor funds for investment in PCI Notes were Arrowhead Capital Partners II, L.P. ("ACP II"), Arrowhead Capital Finance, Ltd. ("ACF"), and the Elistone Fund (all three funds are collectively referred to as the "Arrowhead Funds").  All of the investments by the Arrowhead Funds in PCI Notes were arranged by JAMES NATHAN FRY.

18.   FRY was the founder and Chief Executive Officer of Arrowhead Management, a Minnesota company that acted as Investment Manager for ACP II and made all decisions regarding the acquisition and sale of investments by ACP II.  FRY was also the President, a Director, and the founder of Blue Point Management Ltd., a Bermuda company which acted as the Investment Manager to ACF.  Arrowhead Management also served as investment advisor to the Elistone Fund. FRY solicited money from investors in all of the Arrowhead Funds for investment in PCI Notes.

19.   In approximately 1999, defendant FRANK ELROY VENNES, JR. began collaborating with FRY to raise money for Petters and PCI. VENNES introduced FRY to Petters.  VENNES told FRY that he had invested with, and arranged financing for, PCI for several years and that Petters had requested that VENNES act on Petters' behalf in structuring financing arrangements for PCI.

7

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

20.   In or about 1999, FRY invested the first of the Arrowhead Funds' investor monies in PCI Notes.  From 1999 through September 2008, in approximately 780 investment transactions, the Arrowhead Funds invested more than $500 million dollars of investors' money in PCI Notes.  FRY invested substantially all the funds raised from the Arrowhead investors in PCI Notes.  The Arrowhead Funds remained invested in PCI through September 24, 2008.  As of September 24, 2008, approximately $130 million dollars of Arrowhead Funds' investors' money was in PCI.

21.   From 2001 through September 2008, FRY and Arrowhead Management made more than $41 million in fees related to the Arrowhead Funds' investment in PCI Notes.

22.   Consistent with the understanding VENNES communicated to FRY when he began investing the Arrowhead Funds' investor monies with PCI, all documentation for transactions between the Arrowhead Funds and PCI (for example, promissory notes and security agreements) was required to go through VENNES or one of his employees.  In addition, substantially all communication between PCI/Petters and Arrowhead also went through VENNES or one of his employees.  PCI and/or Petters paid a commission to VENNES for his role.  This commission was calculated as a percentage of the funds VENNES raised for Petters and PCI from the Arrowhead Funds.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

Between 2001 and 2008 VENNES obtained more than $48 million in commissions related to the Arrowhead Funds' investment.

## THE PALM BEACH FUNDS

23. In approximately 2002, VENNES recruited HARROLD and PREVOST to form a hedge fund to raise money for Petters and PCI through investment in PCI Notes. VENNES introduced HARROLD and PREVOST to Petters. VENNES told HARROLD and PREVOST that he had negotiated and arranged financing for PCI for eight years, describing himself as Petters' "financier," and said that Petters had requested that VENNES act on Petters' behalf in structuring financing arrangements for PCI.

24. VENNES told HARROLD and PREVOST that he knew Petters' business "intimately." VENNES explained to HARROLD and PREVOST how the PCI purchase order financing mechanism purportedly operated and VENNES told HARROLD and PREVOST that he had in the past conducted "due diligence" on PCI. Among other things, VENNES told HARROLD and PREVOST:

      a.    That before investing in a PCI deal, VENNES contacted the supplier of the goods purportedly being sold;

      b.    That before investing in a PCI deal, VENNES contacted the alleged purchaser of the goods purportedly being purchased;

9

c.   That before investing in a PCI deal, VENNES verified that "the shipping process had been arranged, that the product is ready for delivery, that a copy of the Bill of Lading has been received, that the whole inventory is insured, and that the terms of the purchase order(s) is/are exact."

25.   VENNES further instructed HARROLD and PREVOST in detail as to how they should structure the hedge fund and how the PCI Note transactions with the hedge fund would operate.   Indeed, VENNES provided HARROLD and PREVOST with documentation created by Arrowhead Management describing the Arrowhead Funds, which HARROLD and PREVOST used as a template for the formation of their own hedge fund and the drafting of written marketing materials describing the funds to investors.   VENNES advised HARROLD and PREVOST that he had an agreement with Petters that all communications with Petters and PCI were required to go through VENNES.

26.   Working with VENNES, HARROLD and PREVOST formed Palm Beach Finance Partners, LP ("PBFP") and Palm Beach Finance II, LP ("PBFII"), as well as two offshore hedge funds, Palm Beach Offshore, Ltd. ("PBO") and Palm Beach Offshore II, Ltd. ("PBOII") (collectively, the "Palm Beach Funds").

27.   HARROLD and PREVOST managed both funds through companies they co-owned: Palm Beach Capital Management, LP ("PB Management LP"), which managed PBFP, and Palm Beach Capital Management, LLC

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

("PB Management LLC"), which managed PBFII.   In this Indictment, the Palm Beach Funds, PREVOST, HARROLD, PB Management LLC and PB Management LP are referred to collectively as "Palm Beach."

28.   In or about November of 2002, HARROLD and PREVOST invested the first of the Palm Beach Funds' investor monies in PCI Notes.   From 2002 through September 2008, in approximately 2,100 investment transactions, the Palm Beach Funds invested more than a billion dollars in PCI Notes.   PREVOST and HARROLD invested substantially all the funds raised from the Palm Beach investors in PCI Notes.   As of September 24, 2008, more than one billion dollars of Palm Beach Funds' investors' money was in PCI.

29.   From 2002 through September 2008, PREVOST, HARROLD, PB Management LP, and PB Management LLC grossed more than $58 million in fees under their agreements with the Palm Beach Funds.

30.   Consistent with the understanding VENNES communicated to HARROLD and PREVOST when they began investing the Palm Beach Funds' investor monies with PCI, all documentation for transactions between the Palm Beach Funds and PCI (for example, promissory notes and security agreements) was required to go through VENNES or one of his employees.   In addition, substantially all communication between PCI/Petters and Palm Beach also went through VENNES or one of his employees.   In exchange for his services, PCI and/or Petters paid a commission to VENNES.   This commission was calculated as a

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

percentage of the funds VENNES raised for Petters and PCI from the Palm Beach Funds.  Between 2003 and 2008 VENNES obtained more than $60 million in commissions related to the Palm Beach Funds investment.

### THE ARROWHEAD "FLOW OF FUNDS" MISREPRESENTATIONS

31.  From in or about 2001 through in or about September 2008, FRY, aided and abetted by VENNES and others, and being aided and abetted by each other, both orally and in written materials, made, or caused to be made, false representations to investors in the Arrowhead Funds.  Specifically, FRY, and others acting at his direction, both verbally and in written materials, made false representations to investors in the Arrowhead Funds regarding the safeguards purportedly provided by the Funds.  FRY, and others acting at his direction, falsely represented to investors that when a "Big Box" retailer purchased consumer electronics or other goods from PCI, in a transaction that was financed by the Arrowhead Funds, the retailer made payment for those goods directly to a bank account controlled by Arrowhead Management.  In truth and in fact, the Arrowhead Funds received all their "payments" for the purported consumer goods from PCI and not from the retailers who were purportedly buying the goods being financed.

32.  FRY and VENNES knew the representation to investors that payment was received directly from retailers was false.  During the

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

life of the Arrowhead Funds, from 1999 through September 24, 2008, no funds were paid by retailers to Arrowhead Management.  FRY and VENNES knew that Arrowhead Management always received payment from PCI, not directly from the retailers.   Nevertheless, FRY, and others acting at his direction, continued to represent falsely to investors that retailers were depositing money directly into bank accounts controlled by Arrowhead Management.  The misrepresentation regarding the true flow of funds in the PCI Note transactions was material to investors in the Arrowhead Funds because it prevented investors from accurately assessing investment risk in two ways.  First, the misrepresentation that funds were being received from retailers falsely assured investors that genuine transactions were taking place.  Second, it falsely assured investors that Arrowhead Management could prevent PCI from simply converting the investors' money for its own use.

33.  VENNES knew that the representations FRY made to the Arrowhead Funds' investors regarding the flow of funds were false, but did nothing to correct the misrepresentation.  Nevertheless, knowing that FRY was lying to the Arrowhead Funds' investors, VENNES continued to act as the conduit between Arrowhead and PCI and he received tens of millions of dollars in commissions from Petters for money brought into PCI through the Arrowhead funds. Moreover, as described below, VENNES provided written materials

13

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

describing the Arrowhead Funds to HARROLD and PREVOST which VENNES knew contained false representations concerning the flow of funds, and which VENNES directed HARROLD and PREVOST to use in creating a written description of the Palm Beach Funds to provide to prospective investors.

### THE PALM BEACH "FLOW OF FUNDS" MISREPRESENTATIONS

34.   The Arrowhead Funds had been investing in PCI Notes for more than a year by the time VENNES began recruiting HARROLD and PREVOST to raise money for Petters/PCI through the Palm Beach Funds.  As set forth above, VENNES instructed HARROLD and PREVOST as to how they should structure the Palm Beach Funds and how the Palm Beach Funds' PCI transactions should operate.  VENNES provided HARROLD and PREVOST Arrowhead's written materials describing the "flow of funds" in the PCI Note transactions in the manner described in paragraph 31, above.  VENNES also orally represented to HARROLD and PREVOST that the Arrowhead Funds received payment from the retailers, not PCI, knowing this representation was false.

35.   HARROLD, PREVOST, and VENNES, aiding and abetting each other, and being aided and abetted by each other, both verbally and in written materials, made false representations to investors in the Palm Beach Funds.  Specifically, HARROLD, PREVOST, and VENNES made, or caused to be made, false representations to investors that when a retailer purchased consumer electronics or other goods from PCI, in a transaction that was financed by the Palm Beach Funds,

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

the "Big Box" retailer made payment for those goods directly to the Palm Beach Funds.   In truth and in fact, the Palm Beach Funds received all their "payments" for the purported consumer goods from PCI and not from the retailers who were purportedly buying the goods being financed.

36.   VENNES, HARROLD and PREVOST knew the representation to investors that payment was received directly from retailers was false.   During the life of the Palm Beach Funds, from 2003 through September 24, 2008, no funds were paid by retailers to the Palm Beach Funds.   VENNES, HARROLD and PREVOST knew that Palm Beach always received payment from PCI, not directly from the retailers. Nevertheless, HARROLD and PREVOST, and others acting at their direction, continued to represent falsely to investors that retailers were depositing money directly into bank accounts controlled by Palm Beach.   As set forth above, the misrepresentation regarding the true flow of funds in the PCI Note transactions was material to investors.   VENNES caused, encouraged and induced PREVOST and HARROLD to make these misrepresentations, which they all knew to be false.

### FRY'S CONCEALMENT OF VENNES'S ROLE/CRIMINAL HISTORY

37.   In or about 1987, defendant VENNES was convicted in the United States District Court for the District of North Dakota of one count of conspiracy to commit money laundering, one count of a firearms crime, and one count of using an interstate communications

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

device in furtherance of a sale of cocaine.  He was sentenced to a total of five years in prison.

38.  FRY was aware that VENNES had previously been convicted of money laundering, as well as guns and narcotics charges. Institutional investors routinely conduct background checks on individuals involved with hedge funds or other entities seeking to manage their funds, and criminal convictions of key personnel are material to investment decisions, especially convictions for financial crimes such as money laundering.  Knowing that VENNES's criminal history was material to investors in the Arrowhead Funds, FRY affirmatively concealed from investors VENNES's involvement in the Arrowhead Funds' transactions with PCI.

## ARROWHEAD MISREPRESENTATIONS ABOUT PCI NOTE PAYMENT PERFORMANCE

39.  The PCI Notes held by the Arrowhead Funds were due in 90 days.  Arrowhead investors were advised by FRY and others acting at his direction, both orally and in written materials, that the PCI Notes had historically paid in 90 days.  When soliciting  investors and potential investors, FRY pointed to the fact that the PCI Notes paid on time as evidence of the strength of the PCI investment. PCI's payment status and the relative payment status of the PCI Notes held by Arrowhead were material to investors.

40.  In the fall of 2007, payments on all PCI Notes held by Arrowhead started to become delayed substantially beyond 90 days. By February of 2008, millions of dollars of PCI Notes were on the

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

verge of going into default, which occurred if payment was not received within 182 days. This information was material to investors, but was not communicated to investors by FRY.

41. FRY concealed the late payments on the PCI Notes from investors. Prior to March 2008, Arrowhead investors received monthly communications which included the average payment dates on the PCI Notes. Starting in March of 2008, in order to conceal the late payments, FRY intentionally omitted from monthly communications to Arrowhead investors the average payment dates of the PCI Notes. In addition, FRY and others acting at his direction, both orally and in written materials, continued to represent to investors that Arrowhead was receiving payments on the PCI Notes in around 90 days.

42. Instead of advising the Arrowhead investors about PCI's apparent inability to pay its notes and the approaching defaults, beginning in or about February 2008, FRY or entities controlled by FRY, aided and abetted by VENNES, developed a scheme to deceive investors and conceal an event of default on the PCI Notes. Namely, FRY and VENNES arranged to extend the payment due date for PCI Notes so they would not be deemed to be in default, without advising investors of the extensions. Documentation for all of the note extensions between Arrowhead and PCI was arranged by, and run through, VENNES.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

43.   During this same time period, FRY was actively seeking new investors, as well as additional money from existing investors, for investment into PCI Notes, without advising them of PCI's performance problems.   From February 2008 - after FRY began to enter into the PCI "note extensions" - until September 2008, FRY raised more than $40 million in new investor money.

**PALM BEACH MISREPRESENTATIONS ABOUT PCI NOTE PAYMENT PERFORMANCE**

44.   The PCI Notes held by the Palm Beach Funds were due in 90 days, and went into default if not paid within 182 days.   Palm Beach investors were advised that PCI had historically paid the notes in approximately 90 days.   PCI's payment status and the relative payment status of the PCI Notes held by Palm Beach were material to Palm Beach investors.

45.   In late 2007, payments from PCI on the PCI Notes held by the Palm Beach Funds started to become delayed beyond 90 days. HARROLD and PREVOST concealed the late payments on the PCI Notes from investors.   Even though after November 2007, all of the PCI Notes held by the Palm Beach Funds went substantially beyond 90 days before paying, Palm Beach continued to falsely report, in monthly communications to investors, that the notes were being paid within the 90-day time-period.   The misrepresentations to investors that PCI was paying its notes when due, when in fact payments were becoming later and later, were material.

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

46. By February 2008, hundreds of millions of dollars of PCI Notes were on the verge of going into default. This information was material to investors, but was not communicated to investors by VENNES, HARROLD, or PREVOST.

47. Instead of advising investors about the delayed payments and the approaching note defaults, in or about February 2008 VENNES proposed to HAROLD and PREVOST a "note swap" arrangement, in which they would exchange the notes which were on the verge of defaulting with other PCI Notes which had later maturity dates. Beginning in or about February 2008, HARROLD and PREVOST, through VENNES, engaged in more than 35 "note swap" transactions. These transactions represented more than 250 individual PCI Notes with a total value of approximately one billion dollars. They created the false appearance that the PCI Notes had not defaulted, and were intended to conceal PCI's inability to pay.

48. Pursuant to the "note swap" arrangement, after PCI delayed paying principal and accrued interest on mature notes, the Palm Beach Funds, on multiple occasions, exchanged groups of notes that were within days of defaulting for newly-issued PCI Notes that would not default for approximately six months and that purported to be collateralized by different merchandise. Instead of receiving cash payments and then reinvesting that cash in new PCI Notes as they had done in the past, HARROLD and PREVOST, aided and abetted by VENNES, simply exchanged old PCI Notes for new ones, in

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

a cashless exchange of paper. Documentation for all note swaps was arranged by, and run through, VENNES.

49. At the same time, HARROLD and PREVOST continued to report, in monthly communications to investors, that the funds were generating the same steady profits that they had generated from their inception. These monthly communications were materially misleading because the defendants omitted to advise investors that the method of calculating profits had changed significantly in that profits were no longer calculated based on actual cash received in payment of the PCI notes, but rather that those profit calculations were now based on treating new notes from PCI as equivalent to actual cash. These new notes were purportedly secured by collateral being sold by the same retailers who were allegedly not paying their existing financial obligations. The misrepresentation to investors that PCI was paying its notes when due, when in fact the Palm Beach Funds were simply receiving "paper payments" in the form of new notes with later maturity dates, secured by collateral held by the same retailers who were not paying the old notes, was material.

50. After the "note swap" arrangement began, VENNES encouraged and induced HARROLD and PREVOST to solicit money from new investors, as well as additional money from existing investors, for PCI Notes. From on or about February 20, 2008, when the "note swaps" began, until on or about September 24, 2008, PREVOST and

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

HARROLD, aided and abetted by VENNES, raised more than $75 million in new investor money.

### VENNES'S MISREPRESENTATIONS TO METRO GEM INVESTORS

### ABOUT PCI NOTE PAYMENT PERFORMANCE

51.   VENNES used most of the money invested with him through his company, Metro Gem, to obtain PCI Notes.  By the fall of 2007, all of the promissory notes issued by PCI to Metro Gem were due within 90 days after the dates they were issued, after which the notes were in default.  By the fall of 2007, payments from PCI started to become delayed beyond 90 days, placing them in default.  Although the PCI Notes eventually were paid off by Petters/PCI, after October of 2007, all PCI Notes were paid only after they had gone into default.  This information was material to investors, but was not communicated to investors by VENNES.

52.   Rather than disclose to investors that all of the PCI Notes held by Metro Gem were paying only after going into default, VENNES informed some investors that he was being "slow paid" on some of the notes.  He did not inform investors that by May 2008, PCI Notes held by Metro Gem were being paid more than 50 days after they went into default.  Instead, VENNES continued to make regular interest payments to Metro Gem investors, sometimes taking money from new investors and using it to pay existing investors.  These "lulling payments" were designed to give the false impression that the PCI investment was performing normally.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

53.   In or about July 2008, Petters told VENNES that there was fraud at PCI and that the PCI Notes were "compromised."   When VENNES asked about the extent of the fraud, Petters told him it could be as much as twenty-percent of the PCI Notes.   VENNES concealed this material information from Metro Gem investors. Similarly, although he was the principal source of communication between PCI and the Arrowhead and Palm Beach Funds, he did not disclose that he had been told that there was fraud related to the PCI Notes to either Arrowhead or Palm Beach investors.   Instead, during this same time period, VENNES himself sought, and encouraged FRY, HARROLD and PREVOST to seek, new investors, as well as additional money from existing investors.

54.   By no later than June 17, 2008, VENNES knew that at least some of the Metro Gem investors' money which he sent to PCI was not being used to buy consumer electronics or other consumer merchandise, and instead was being used to pay off the holders of existing PCI Notes.   Nevertheless, VENNES continued to take money from Metro Gem investors telling them that the money was going to PCI to finance the purchase of consumer goods.   On or about July 2, 2008, VENNES took $10 million from Metro Gem investor "P.F." based on the representation to P.F. that the money would be going to PCI to finance the purchase of consumer goods for resale to a "Big Box" retailer.   Instead, VENNES knew that the $10 million he took from P.F. was going to be used by PCI to pay off other investors.   On or

about July 2, 2008, VENNES sent the $10 million he took from P.F. to PCI, and, consistent with VENNES's understanding when he sent the money to PCI, on the same date PCI used that money to pay Palm Beach investors.

55.  By no later than August of 2008: (a) VENNES had been advised by Petters that there was fraud at PCI and that the PCI Notes were "compromised;" (b) VENNES knew that PCI had substantial problems paying more than a billion dollars of PCI Notes held by the Arrowhead Funds, the Palm Beach Funds and Metro Gem; (c) VENNES knew that money invested with PCI was being used to pay existing PCI investors, rather than for financing consumer electronics tranactions; and (d) VENNES was attempting to liquidate Metro Gem's investments with PCI below the stated value of the notes.  All of this information was material to Metro Gem investors.  VENNES did not disclose it to investors.

56.  Nevertheless, without disclosing the foregoing, on August 26, 2008, VENNES took $220,000 from Metro Gem investor "C.C." with the understanding that the money would be used to invest in a PCI Note.  On September 4, 2008, VENNES took another $180,000 from Metro Gem investor C.C. with the understanding that the money would be used to invest in a PCI Note.  Rather than use the funds as promised, VENNES used those funds for other purposes, including mortgage payments on two of his houses, as well as car payments,

23

credit card payments, and "lulling" interest payments to other Metro Gem investors.

## BANK FRAUD (VENNES)

57.   In or about April 2003, VENNES initiated a banking relationship with Home Federal Savings Bank.  Among other things, VENNES obtained from the bank a multi-million credit line that was secured by PCI promissory notes issued to Metro Gem.  To induce the bank's reliance on the PCI Notes as collateral, VENNES made the following false and material representations:

      a.   That before investing in a PCI deal, VENNES would contact the supplier of the goods purportedly being sold;

      b.   That before investing in a PCI deal, VENNES would contact the alleged purchaser of the goods purportedly being purchased;

      c.   That before investing in a PCI deal, VENNES would verify that "the shipping process had been arranged, that the product is ready for delivery, that a copy of the Bill of Lading has been received, that the whole inventory is insured, and that the terms of the purchase order(s) is/are exact"; and

      d.   That VENNES' employees checked the delivery trucks. Had VENNES in fact done any of the foregoing, he would have known that the transactions underlying the Petters/PCI Notes were fictitious and that Petters was operating a Ponzi scheme.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

58.  In May 2008, although VENNES knew PCI had been unable to repay more than a billion dollars to the Palm Beach Funds and the Arrowhead Funds, and PCI had been re-paying the PCI Notes held by Metro Gem long after the 90-day maturity date, notwithstanding his affirmative contractual obligation to notify Home Federal Savings Bank if the PCI Notes held as collateral went into default, VENNES falsely represented to a bank employee that the PCI Notes were paying as agreed in order to induce Home Federal Savings Bank to renew a $12 million credit line and lend VENNES millions of dollars.  VENNES did not disclose, and concealed from the bank, the substantial problems he knew PCI had repaying its PCI Notes to VENNES, Palm Beach and Arrowhead.

## COUNTS 1 - 5
(Securities Fraud - Arrowhead Funds)

59.  The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

60.  From in or about 2001 through and including on or about September 24, 2008, in the State and District of Minnesota and elsewhere, the defendants,

**JAMES NATHAN FRY and**
**FRANK ELROY VENNES, JR.,**

each aiding and abetting one another, and being aided and abetted by one another and by others known and unknown to the Grand Jury, did knowingly and deliberately, offer and sell securities and, by

25

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

the use of means and instrumentalities of interstate commerce, directly and indirectly, employed a scheme and artifice to defraud, obtained money by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in a transaction, practice or course of business which operated as a fraud or deceit upon the purchaser of securities, as set forth above in paragraphs 31 - 33 and 37 - 43 above, in violation of Title 15, United States Code, Sections 77q(a) and 77(x).

61.  On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendants,

**JAMES NATHAN FRY and
FRANK ELROY VENNES, JR.,**

each aiding and abetting one another, and being aided and abetted by one another and by others known and unknown to the Grand Jury, for the purpose of executing the securities fraud set forth above, made, or caused to be made, the following communications to the following investors and potential investors:

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

| Count | Date (on or about) | Material Misrepresentation Made to | Nature of Material Misrepresentation |
|-------|--------------------|------------------------------------|--------------------------------------|
| 1 | October 3, 2006 | H.C.M. | ACP II Private Placement Memorandum Misrepresenting the PCI Flow of Funds and Concealing Vennes's Role and Criminal History |
| 2 | March 21, 2007 | H.C.M. | 2006 Audited Financials Misrepresenting the PCI Flow of Funds and Concealing Vennes's Role and Criminal History |
| 3 | March 21, 2007 | S.S.R.C.P. | 2006 Audited Financials Misrepresenting the PCI Flow of Funds and Concealing Vennes's Role and Criminal History |
| 4 | June 12, 2008 | H.C.M. | May 2008 Monthly Performance Summary for ACP II Concealing PCI Note Payment Performance |
| 5 | July 29, 2008 | S.S.R.C.P. | Email Containing Misrepresentations and Omissions about PCI Note Payment Performance |

All in violation of  Title 15, United States Code, Sections 77q(a) and 77(x), and Title 18, United States Code, Section 2.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

## COUNTS 6 - 9
### (Wire Fraud - Arrowhead Funds)

62.  The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

63.  On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendants,

### JAMES NATHAN FRY and
### FRANK ELROY VENNES, JR.,

each aiding and abetting one another, and being aided and abetted by one another and by others known and unknown to the Grand Jury, did knowingly and unlawfully devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is described above in paragraphs 31 - 33 and 37 - 43; and for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds, for the purpose of executing the above-described scheme and artifice as follows:

| Count | Date of Wire (on or about) | Wire |
|-------|---------------------------|------|
| 6 | November 1, 2007 | Wire transfer of $1,500,000.00 from T.G.A. Account at Fortis Bank to Citco Banking Corp. N.V. |

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

| 7 | April 11, 2008 | Email from Arrowhead Management to H.C.M. containing March 2008 Monthly Performance Summary for ACP II |
| 8 | July 2008 | Email from Arrowhead Management to H.C.M. containing response to H.C.M. Due Diligence Questionnaire |
| 9 | September 1, 2008 | Wire transfer of $250,000.00 from T.G.A. Account at Fortis Bank to Citco Banking Corp. N.V. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 10 - 12
(Securities Fraud - Palm Beach Funds)

64.  The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

65.  From in or about 2002 through and including on or about September 24, 2008, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

aiding and abetting DAVID WILLIAM HARROLD and BRUCE FRANCIS PREVOST, and being aided and abetted by one another, did knowingly and deliberately, offer and sell securities and, by the use of means and instrumentalities of interstate commerce, directly and indirectly, employed a scheme and artifice to defraud, obtained

29

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

money by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in a transaction, practice or course of business which operated as a fraud or deceit upon the purchaser of securities, as set forth above in paragraphs 34 - 36 and 44 - 50, in violation of Title 15, United States Code, Sections 77q(a) and 77(x).

66.   On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

aiding and abetting DAVID WILLIAM HARROLD and BRUCE FRANCIS PREVOST, and being aided and abetted by each other, for the purpose of executing the securities fraud set forth above, made, or caused to be made, the following communications to the following investors and potential investors:

| Count | Date (on or about) | Material Misrepresentation Made to | Nature of Material Misrepresentation |
|-------|--------------------|-----------------------------------|--------------------------------------|
| 10    | May 28, 2008       | S.A.                              | False March and April Fund Performance Statistics |
| 11    | June 12, 2008      | A.F.                              | Telephone call in which investor is told retailer pays Palm Beach for PCI Notes |

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

| 12 | April 1, 2008 | M.B. | Telephone call in which investor is told retailer pays Palm Beach for PCI Notes |
|----|---------------|------|---------------------------------------------|

All in violation of  Title 15, United States Code, Sections 77q(a) and 77(x), and Title 18, United States Code, Section 2.

## COUNTS 13 - 14
(Mail Fraud - Metro Gem)

67.   The  Grand  Jury  hereby  realleges  and  incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

68.   On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

aided and abetted by persons known and unknown to the Grand Jury, did knowingly and unlawfully devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises,  which  scheme  and  artifice  is  described  above  in paragraphs 51 - 56; and for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly cause to be sent, delivered, and moved by the United States Postal Service and interstate commercial carrier various mailings, items and things, as described below:

31

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

| Count | Date of Mailing (on or about) | Mailing |
|-------|-------------------------------|---------|
| 13 | August 26, 2008 | Promissory note for principal amount of $220,000 from Metro Gem to C.H. |
| 14 | September 4, 2008 | Promissory note for principal amount of $180,000 from Metro Gem to C.H. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

### COUNTS 15 - 16
(Wire Fraud - Metro Gem)

69.  The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

70.  On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

aided and abetted by persons known and unknown to the Grand Jury, did knowingly and unlawfully devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is described above in paragraphs 51 - 56; and for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire

32

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

communications in interstate commerce, certain writings, signs, signals, and sounds, for the purpose of executing the above-described scheme and artifice as follows:

| Count | Date of Wire (on or about) | Wire |
|-------|----------------------------|------|
| 15 | July 2, 2008 | Wire transfer of $3,200,000.00 from P.F. Schwab Institutional Account to Metro Gem Home Federal Savings Bank Account |
| 16 | July 2, 2008 | Wire transfer of $6,800,000.00 from P.F. Schwab Institutional Account to Metro Gem Home Federal Savings Bank Account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

### COUNTS 17 - 19
(Bank Fraud)

71. The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

72. Beginning in or about 2003, and continuing through September 2008, the defendant,

**FRANK ELROY VENNES, JR.,**

devised a scheme and artifice to defraud Home Federal Savings Bank, and to obtain money, funds and credits owned by and under the custody and control of Home Federal Savings Bank, by means of false

33

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

and fraudulent pretenses, representations and promises as described above in paragraphs 57 and 58.

<b>EXECUTION OF THE SCHEME AND ARTIFICE</b>

73.    On or about the dates stated below, within the District of Minnesota and elsewhere, the defendant executed and attempted to execute the scheme and artifice, by causing Home Federal Savings Bank to disburse proceeds from a credit line in the approximate amounts set forth below:

| Count | Date (on or about) | Disbursement amount |
|-------|--------------------|--------------------|
| 17    | June 2, 2008       | $5,000,000.00      |
| 18    | July 15, 2008      | $250,000.00        |
| 19    | July 21, 2008      | $2,800,000.00      |

All in violation of Title 18, United States Code, Section 1344.

<b>COUNT 20</b><br>(False Statements on Credit Application)

74.    The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

75.    In or about April 2003, in the District of Minnesota, defendant,

<b>FRANK ELROY VENNES, JR.,</b>

did knowingly make false statements and reports for the purpose of influencing the action of Home Federal Savings Bank, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, in connection with an application for a

34

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

credit line for Metro Gem, Inc., namely the defendant made representations regarding diligence he purportedly performed which he knew to be false.

All in violation of Title 18, United States Code, Section 1014.

### COUNT 21
#### (False Statements on Credit Application)

76. The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

77. In or about May 2008, in the District of Minnesota, defendant,

**FRANK ELROY VENNES, JR.,**

did knowingly make false statements and reports for the purpose of influencing the action of Home Federal Savings Bank, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, in connection with an application for a renewed credit line for Metro Gem, Inc., namely the defendant made representations regarding the performance of the collateral for the credit line, the PCI Notes, which he knew to be false.

All in violation of Title 18, United States Code, Section 1014.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

## COUNTS 22 - 24
(Money Laundering)

78.   The  Grand  Jury  hereby  realleges  and  incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

79.   On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

knowingly engaged and attempted to engage in a monetary transaction affecting interstate commerce, in criminally-derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, the defendant obtained funds from victims through fraud as set forth above in Counts 10 through 16, and engaged in the monetary transaction set forth below:

| Count | Date (on or about) | Amount | Description |
|-------|--------------------|--------|-------------|
| 22 | 8/25/08 | $10,688.39 | Issuance of a check payable to Countrywide Home Loans, for a mortgage payment on VENNES's personal residence at XXXXX XXXXXXX XXXX Road, Shorewood, MN. |
| 23 | 8/25/08 | $17,187.50 | Issuance of a check payable to Chase Home Finance, for a mortgage payment on VENNES's personal residence at XX XXXXX Drive, Jupiter, FL. |

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

| 24 | 9/4/08 | $98,814.12 | Check payable to the law firm of Howse & Thompson, P.A. |
|----|--------|------------|----------------------------------------------------------|

All in violation of Title 18, United States Code, Section 1957.

## COUNT 25
(False Statement)

80. The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

81. On October 25, 2010, in the State and District of Minnesota, in a matter within the jurisdiction of the Securities and Exchange Commission, the defendant,

**JAMES NATHAN FRY**,

while testifying under oath, did knowingly and willfully make a material false statement and representation to the Securities and Exchange Commission, an agency of the United States, all in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT 26
(False Statement)

82. The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

83. On October 26, 2010, in the State and District of Minnesota, in a matter within the jurisdiction of the Securities and Exchange Commission, the defendant,

**JAMES NATHAN FRY**,

while testifying under oath, did knowingly and willfully make a material false statement and representation to the Securities and Exchange Commission, an agency of the United States, all in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT 27
(False Statement)

84. The Grand Jury hereby realleges and incorporates paragraphs 1 through 58 of this Indictment as if stated in full herein.

85. On November 5, 2010, in the State and District of Minnesota, in a matter within the jurisdiction of the Securities and Exchange Commission, the defendant,

**JAMES NATHAN FRY**,

while testifying under oath, did knowingly and willfully make a material false statement and representation to the Securities and Exchange Commission, an agency of the United States, all in violation of Title 18, United States Code, Section 1001(a)(2).

## FORFEITURE ALLEGATIONS

All counts of this Indictment are hereby realleged and incorporated herein for the purpose of alleging forfeitures.

U.S. v. Frank Elroy Vennes, Jr., et al., Crim. No. 11-141 (RHK/JJK)

If convicted of any of the offenses charged in Counts 1 through 16 of this Indictment, the defendants named therein shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 15, United States Code, Sections 77q(a) and 77(x), and/or Title 18, United States Code, Sections 1341 and 1343.

If convicted of any of the offenses charged in Counts 17 through 21 of this Indictment, defendant Frank Elroy Vennes, Jr. shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any and all property, real or person, constituting or derived from proceeds the person obtained directly or indirectly as the result of such violation.

If convicted of any of the offenses charged in Counts 22 through 24 of this Indictment, defendant Frank Elroy Vennes, Jr. shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) any and all real or personal property involved in any such violation, and any and all property traceable to such property.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21,

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>, Crim. No. 11-141 (RHK/JJK)

United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____        _____

UNITED STATES ATTORNEY                   FOREPERSON